***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Dollar. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Dollar.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. The defendant was a duly qualified self-insured, with Allied Claims Administration as the servicing agent.
3. The employee-employer relationship existed between the parties at all relevant times.
4. The alleged date of injury is October 21, 1999.
5. The issue for determination is whether the plaintiff has contracted a compensable occupational disease, and if so, to what benefits may she be entitled under the Act.
6. Judicial Notice is taken of I.C. Forms 18, 61, 33, 33R, MSC4 and MSC5.
7. The parties stipulated the following exhibits into the record:
a. Records of Susan Ferguson, LCSW, RN — twenty-seven pages;
b. Records of Dr. Laurie R. Leach — seven pages;
c. Records of Dr. Marjorie E. Merod — thirty-one pages;
d. Records of Dr. Patricia K. Naslund — two pages;
e. Records of Dr. Claudia J. Svara — two pages;
f. Records of Dr. Treva W. Tyson — one hundred twenty-six pages;
g. Records of Dr. Katherine G. Wu — fourteen pages;
h. Records of National Health Laboratories — seventeen pages;
i. Records from Raleigh Imaging Services — two pages;
j. Records from Rex Healthcare — one hundred three pages; and
k. Records from Wake Radiology Diagnostic Imaging, Inc — one page.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a forty-five year old married female high school graduate. She had three adult sons, ages 26, 24 and 21. Plaintiff completed college courses in commercial food service and she worked in institutional food service in the New Hanover County public schools and at a nursing home. She had a prior cervical fusion after an automobile accident when she was twenty-eight years old. She had also undergone a splenectomy, hysterectomy, and surgery for an ovarian cyst. She has also required ongoing treatment for recurrent urinary tract infections, dermokeratosis and Raynaud's disease.
2. On March 18, 1997, plaintiff began treating with Dr. Treva Tyson of Wake Internal Medicine Consultants. Dr. Tyson prescribed Synthroid for her hypothyroidism. On July 9, 1997, plaintiff reported a history of treatment for bladder polyps and recurrent urinary tract infections. Plaintiff was evaluated at that time for a mass at the urethra and underwent a procedure at Rex Hospital for this condition.
3. In 1992, plaintiff began working as a part-time supervisor on the patient tray-line at Rex Hospital. She became a full-time supervisor after one month. Her duties included overseeing sanitation, supervising fourteen employees in the preparation of trays, checking diets, monitoring food temperatures, changing menus and filling in on the tray-line when employees were absent.
4. Each employee on the tray-line was assigned to the same portion on the line each day. The kitchen served breakfast, lunch and dinner daily. Other meals were also occasionally served. There were down times between meals when the food service workers were not busy preparing trays. However, the work on the tray-line moved at a fast pace when patient trays were being prepared.
5. In 1996, plaintiff was promoted to manager. She spent seventy-five percent of her time on the floor and twenty-five percent of her time in the office. The managers worked directly with the coordinators. Plaintiff worked a twelve-hour shift. She was primarily responsible for making sure the food carts left the kitchen promptly. As a manager, plaintiff was responsible for interviewing and hiring her staff. However, she had a great deal of difficulty retaining staff, due to absenteeism.
6. Plaintiff received good evaluations from June of 1992 through December of 1998, and she was very proud of her evaluations.
7. In August of 1998, Rex Hospital contracted with Sedexho-Marriott to manage the hospital's food service, due to the need to improve efficiency and quality of food service.
8. Sedexho-Marriott's Food Service director, Mike Cuddy, conducted substantial reorganization procedures to implement the gold check system. Mr. Cuddy filled some managerial and supervisory positions with Sedexho employees.
9. Plaintiff testified she began to experience health problems around 1995 or 1996, when she had a hysterectomy. Six to seven months later, she had an ovarian cyst for which she required emergency surgery. She had a benign breast lump in 1997. In 1998, she was hospitalized for idiopathic pancreatitis. In February 1999, plaintiff underwent an antral biopsy to aid in diagnosis of epigastric pain. After plaintiff discussed how stressful her life was, Dr. Tyson prescribed Zoloft, beginning February 15, 1999. During her annual physical in June of 1999, plaintiff reported the Zoloft had helped with her stress level but she was still having trouble sleeping. She also indicated she had changed jobs, which had helped reduce her stress. However, plaintiff had a forty-pound weight gain with the Zoloft and Synthroid combination. In May of 1999, an abdominal CT revealed a liver granuloma. Dr. Tyson later found spots on plaintiff's spleen and liver, which were possibly cancerous. Plaintiff underwent a splenectomy in 1999 and learned her spleen was covered with granulomas.
10. In August of 1999, plaintiff sought treatment from Dr. Tyson for esophageal spasms and pain on two occasions. An endoscopy was performed on August 25, 1999 for cannulation of the biliary system and pancreatic duct, but found no evidence of salt crystals.
11. On October 20, 1999, plaintiff returned to Dr. Tyson for recurrent epigastric discomfort of eight days duration.
12. When Sedexho-Marriott began running the hospital's food service, there were more employees and managers. Plaintiff had more time to devote to other duties, such as interviewing new employees. However, she continued to make poor hiring decisions.
13. Because plaintiff's compliance with the gold check system was poor, Mr. Cuddy brought a Sedexho food service manager in to train plaintiff on policy, procedure and practice. However, even this additional training did not improve plaintiff's job performance. Plaintiff continued to follow her own procedures, which were inefficient and unorganized, rather than learn and comply with the Sedexho procedures.
14. In 1999, Mr. Cuddy met with plaintiff regarding her performance. During the meeting, he informed plaintiff she could continue to work to improve her performance and meet the managerial goals, or she could step back to a food service coordinator position. Plaintiff requested a demotion to return to the food service coordinator job, as she would no longer have to prepare paperwork or hire employees in April of 1999.
15. Mr. Cuddy later hired Willie Stewart as the tray-line manager. Shortly after he was hired, plaintiff reported to Mr. Cuddy that Mr. Stewart's language was offensive. Mr. Cuddy had a conference with the two, and thereafter, things improved. However, plaintiff still did not like Mr. Stewart.
16. On October 21, 1999, Mr. Stewart was set to give plaintiff her 90-day evaluation. Mr. Cuddy informed all employees to expect lower scores on evaluations as they learned the Sedexho-Marriott System. Plaintiff disagreed with Mr. Stewart critiquing the tray-line team's performance in her evaluation. The evaluation showed a number of "successfully developing" ratings.
17. Plaintiff became upset during the evaluation and refused to sign it. She left the conference and tried to work. She could not and went to telephone her husband. Instead of calling him, plaintiff called her family physician, Dr. Treva Tyson, and reported she believed she was having a nervous breakdown.
18. Plaintiff told Mr. Cuddy she had to leave. She did not recall going to her car or driving. Her husband met her in the parking lot at the doctor's office and took her to the doctor who suggested she see a therapist.
19. On October 21, 1999, Dr. Jonathan Flescher saw plaintiff at Wake Internal Medicine and diagnosed her with severe anxiety for which Xanax and additional Zoloft were prescribed.
20. Plaintiff has not worked since October 21, 1999 for any employer.
21. Plaintiff did not tell Mr. Cuddy or anyone in the food department that she was being treated for psychological problems which she contended were related to the job.
22. On October 26, 1999, Dr. Tyson recommended counseling and testing for plaintiff's psychiatric disorder.
23. Plaintiff filed for a leave of absence on October 26, 1999. On her claim form, plaintiff indicated she was filing due to stress related to her occupation since October 20, 1999. She did not inform Mr. Cuddy or anyone responsible for workers' compensation of her contention when she submitted the leave of absence request.
24. Co-supervisor Robert Fotch had twenty-five years of experience in industrial and restaurant food service. Based on his food service experience, Mr. Fotch opined the hospital food service required employees to be punctual and work in a fast-paced manner.
25. Mr. Fotch was responsible for hiring, firing and supervising all food production staff, including cooks, salad attendants, bakers, and stockroom personnel. He has never known of any food service worker with psychological or physical problems due to job stress.
26. During the course of their working together, plaintiff did not complain to Mr. Fotch of work stress. Mr. Fotch opined plaintiff brought on a lot of stress herself due to the poor choices she made in hiring new employees.
27. Dr. Tyson treated plaintiff on December 28, 1999, at which time she noted plaintiff's brain MRI was reported as normal. Dr. Tyson prescribed Effexor.
28. On February 17, 2000, plaintiff sought treatment from psychiatrist Dr. Katherine G. Wu. Dr. Wu found plaintiff disabled by the psychiatric illness and noted plaintiff had significant cognitive impairment with very poor memory, difficulty with reading and comprehension, and the inability to perform complex tasks. She diagnosed plaintiff with depression, anxiety and depersonalization. Plaintiff reported this episode was precipitated by high stress at work and numerous medical problems. She noted plaintiff had been on Zoloft for over a year. Dr. Wu prescribed Serzone, Wellbutrin, Ritalin, Concerta and Lorazepam for the major depressive disorder and depersonalization.
29. Plaintiff's father was physically abusive to plaintiff and her siblings. Dr. Wu opined plaintiff had post-traumatic stress disorder due to the childhood abuse she suffered.
30. Plaintiff had many stressors due to her personal life, including her husband's depression and pervasive unhappiness. He resigned from his construction job in 1999 and sought other work. The older two sons served in the Coast Guard and after their discharge, they moved back in with their parents. However, the other son had married and since moved out, and plaintiff put her house on the market. She found this to be very stressful. At the hearing before the Deputy Commissioner, plaintiff testified "everyday of my life was stressful." Plaintiff also has a stressful relationship with one of her daughter's in-law, who temporarily lived with plaintiff.
31. Between April 29, 1999 and April 24, 2001, plaintiff treated with Dr. Claudia J. Svara of Raleigh Rheumatology Consultants for an extensive history of Raynaud's symptoms and migratory joint pain. Dr. Svara saw plaintiff on March 6, 2001 for elevated ANA levels.
32. Plaintiff was involved in a motor vehicle accident in January of 2000.
33. Dr. Wu referred plaintiff to Susan Ferguson, LCSW, RN, for counseling services between March 26, 2000 and June 7, 2001. Throughout these sessions, plaintiff reported stress due to her numerous medical problems and due to her family relations. However, she did not discuss her job.
34. On April 25, 2000, plaintiff told Ms. Ferguson her FMLA was ending and questioned if her breakdown was related to her employment. At the hearing, plaintiff testified that she did not know her psychological condition was related to her employment until this conversation with Ms. Ferguson.
35. On her I.C. Form 18, filed on June 20, 2001, plaintiff noted an injury date of October 21, 1999, which resulted in mental breakdown. However, the evidence in the record clearly establishes plaintiff and Susan Ferguson discussed this on April 25, 2000, and not in 2001.
36. On April 30, 2002, defendant filed an I.C. Form 61 denial on which it reflected the claim does not meet N.C. Gen. Stat. §97-53(13).
37. Plaintiff filed the I.C. Form 33 Request for Hearing on May 21, 2002.
38. Defendant filed the I.C. Form 33R Response to Request for Hearing on May 28, 2002.
39. One of plaintiff's sisters is being treated for severe depression. Another sister is a substance abuser diagnosed with drug-induced schizophrenia. A third sister has undergone therapy for an obsessive-compulsive-type disorder. Plaintiff also told Susan Ferguson that she recalled her mother going through episodes like this.
40. Board certified psychiatrist and neuropsychiatry specialist Dr. C. Thomas Gualtieri performed an independent psychiatric evaluation on January 29, 2003, during which plaintiff underwent testing and screening. Dr. Gualtieri also reviewed plaintiff's extensive medical history.
41. After examination, Dr. Gualtieri opined and the Full Commission finds as fact that plaintiff's diagnosis of mixed anxiety and depression and dissociated disorder were not characteristic of or peculiar to plaintiff's food service job. Further, plaintiff found relationships at work stressful rather than the work itself.
42. The greater weight of the evidence of record demonstrates that plaintiff's strong family history of severe psychiatric illness, including obsessive-compulsive disorder, psychosis, alcoholism and achalasia was the primary cause for plaintiff's mental illness. A secondary cause was plaintiff's being a victim of physical and verbal abuse in her childhood, which led to dissociation. While plaintiff's work relationships may have contributed to her condition, it did not cause her psychiatric condition.
43. Although Dr. Wu testified plaintiff's work caused or contributed to the psychiatric condition, her psychiatric treatment records focused on other personal stressors, including childhood abuse and family relationships, and did not mention her work. Therefore, Dr. Wu's attempts to testify in contradiction to her treatment records are specifically rejected as inconsistent with her own treatment notes.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The plaintiff bears the burden of proving each element of compensability in order to prove the existence of an occupational disease within the meaning of N.C. Gen. Stat. § 97-53(13). This requires the plaintiff to show that (1) the disease must be characteristic of a trade or occupation; (2) the disease must not be an ordinary disease of life to which the public is equally exposed outside of the employment; and (3) there must be proof of causation. Hansel v. Sherman Textiles, 304 N.C. 44,283 S.E.2d 101 (1981). In the instant case, plaintiff has failed to establish these elements by competent evidence.
2. Plaintiff has failed to prove by the greater weight of the evidence that her employment with defendant-employer exposed her to a greater risk of developing mixed anxiety, depression and dissociated disorder as compared to the general public. N.C. Gen. Stat. § 97-53(13); Rutledge v. Tultex Corp., 308 N.C. 85,301 S.E.2d 359 (1983); Norris v. Drexel Heritage Furnishings, Inc.,139 N.C. 620, 534 S.E.2d 259 (2000); Futrell v. Resinall,151 N.C. App. 456, 566 S.E.2d 181, affirmed, 357 N.C. 158,579 S.E.2d 269 (2003).
3. There is likewise no evidence in the record to suggest that the plaintiff suffered an injury by accident on or about October 21, 1999, within the meaning of N.C. Gen. Stat. § 97-2(6). Even assuming arguendo plaintiff's condition was as a result of her work, plaintiff failed to give timely notice of her claim without reasonable excuse. N.C. Gen. Stat. §§ 97-22; 97-58. The defendant was prejudiced by her failure to give timely notice due to the extensive medical and psychiatric treatment sought.
4. Plaintiff has failed to carry her burden of proof. Therefore, plaintiff is not entitled to recover benefits under the Act. N.C. Gen. Stat. §§ 97-53(13); 97-2(6).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim is hereby, and the same shall be, denied.
2. Defendants shall pay the costs of this action.
This the ___ day of May, 2004.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER